UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Power Authority of the State of New York, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **CASE NO.** 14-cv-0617 (PAC) |
| | : | |
| The tug *M/V ELLEN S. BOUCHARD*, and the barge | : | |
| *B. NO. 280*, their engines, apparel, tackle, boats, | : | |
| appurtenances, etc., *in rem*, and Bouchard | : | |
| Transportation Co., Inc., Motor Tug Ellen S. | : | |
| Bouchard, Inc., and B. No. 280 Corp., *in personam*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| IN THE MATTER OF THE COMPLAINT OF | : | |
| | : | |
| BOUCHARD   TRANSPORTATION   CO.,   INC., | : | |
| MOTOR TUG ELLEN S. BOUCHARD INC., and B. | : | |
| NO. 280 CORPORATION, | : | **CASE NO.** 14-cv-1262 (PAC) |
| | : | |
| AS OWNERS, OWNERS *PRO HAC VICE*, AND | : | |
| OPERATORS OF THE: | : | |
| | : | |
| BARGE  B.  NO.  280  and  TUG  ELLEN  S. | : | |
| BOUCHARD | : | |
| | : | |

**CABLE INTERESTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
*IN LIMINE* TO PRECLUDE PORTIONS OF THE MAIN AND SUPPLEMENTAL
REPORTS AND TESTIMONY OF BOUCHARD'S EXPERT
CAPTAIN R. RUSSELL JOHNSON**

## **TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 2

LEGAL STANDARDS FOR THE ADMISSIBILITY OF EXPERT TESTIMONY .................... 6

ARGUMENT ..................................................................................................................... 7

   I.    JOHNSON IS NOT QUALIFIED TO TESTIFY AS TO THE APPLICABLE
       ANCHORING REGULATIONS FOR HEMPSTEAD HARBOR. .................................. 7

   II.   JOHNSON'S OPINIONS AS TO INDUSTRY PRACTICE FOR MONITORING
       AND OVERSIGHT OF ANCHORING LACK VALID METHODOLOGY AND
       SHOULD BE EXCLUDED. ............................................................................... 9

   III.  JOHNSON'S FACTUAL NARRATIVES, AND CONCLUSORY OPINIONS
       ARE INADMISSIBLE AS EXPERT TESTIMONY. ....................................... 12

     A.   Johnson's Improper Factual Narratives Should be Stricken. .................................... 12

     B.   Johnson's Conclusory Opinions go to the Ultimate Questions and Should be
        Precluded. ............................................................................................... 15

CONCLUSION .................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
   No. 14-CV-6544(KAM)(GRB), 2019 WL 2330855 (E.D.N.Y. May 31, 2019) ......................1

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...............................................................................................1, 7, 10

*Forte v. Liquidnet Holdings, Inc.*,
   675 F. App'x 21 (2d Cir. 2017) ..............................................................................10

*In re M/V MSC Flaminia*,
   No. 12-cv-8892 (KBF), 2017 WL 3208598 (July 28, 2017 S.D.N.Y.) ......................... *passim*

*Reno v. Cnty. of Putnam*,
   No. 16 CV 5179, 2020 WL 206466 (S.D.N.Y. Jan. 14, 2020) ....................................1

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999).......................................................................................10

*U.S. SEC v. Mudd*,
   No. 11 Civ. 9202 (PAC), 2016 U.S. Dist. LEXIS 59273 (May 3, 2016
   S.D.N.Y.) ...............................................................................................................6

*Winfield v. City of New York*,
   No. 15-cv-05236 (LTS)(KHP), 2017 WL 2880556 (S.D.N.Y. Jul. 5, 2017) ...........................1

**Regulations and Rules**

33 C.F.R. Pt. 110.155.............................................................................................1, 8

FED. R. EVID. 104...................................................................................................1, 6

FED. R. EVID. 702.........................................................................................1, 6, 7, 12, 15

FED. R. EVID. 703.................................................................................................1, 11

## INTRODUCTION

Cable Interests[1] respectfully move this Court, pursuant to Fed. R. Evid. ("Rules") 104, 702 and 703 and *Daubert* (*infra*) to exclude portions of the main and supplemental reports[2] and opinion testimony of Captain R. Russell Johnson ("Johnson"), an expert witness retained on behalf of Bouchard.[3]

Johnson admitted at his deposition that he is not an expert in the applicable regulations[4] for anchoring in the Port of New York and based on that admission he should be precluded from offering any opinions concerning anchoring regulations in Hempstead Harbor. Johnson's opinions which rely on informal telephone polling of tug and tow operators should be stricken as improper because they are based on unreliable hearsay. In addition, Johnson offers improper factual narratives and conclusory opinions throughout his Main and Supplemental Reports. In many cases, Johnson's narratives and conclusory statements opine on the ultimate questions reserved for

---

[1] Limitation Defendant/Claimant Power Authority of the State of New York ("NYPA"), by and through their attorneys, Holland & Knight LLP, and Limitation Defendants/Claimants Underwriters Group One (as defined in 14-cv-1262, Dkt. # 26), by and through their attorneys, Foran Glennon Palandech Ponzi & Rudloff PC, and Limitation Defendant/Claimants Underwriters Group Two (*Id.*), by and through their attorneys, Cozen O'Connor (NYPA, Underwriters Group One and Underwriters Group Two collectively, "Cable Interests").

[2] As opposed to expert testimony at trial, generally, expert reports are not admissible. *See Reno v. Cnty. of Putnam*, No. 16 CV 5179 (LMS), 2020 WL 206466, *2 n.4 (S.D.N.Y. Jan. 14, 2020) ("Although the parties sometimes stipulate to admit an expert report, in most instances it would not be separately admissible at trial under the Federal Rules of Evidence…"); *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, No. 14-CV-6544(KAM)(GRB), 2019 WL 2330855, *15 (E.D.N.Y. May 31, 2019) (expert reports will not be admitted as documentary evidence); *Winfield v. City of New York*, No. 15-cv-05236 (LTS)(KHP), 2017 WL 2880556, *4 n.2 (S.D.N.Y. Jul. 5, 2017) ("Expert reports themselves are typically subject to hearsay objections and not admitted into evidence at trial."). That said, certainly in a non-jury trial (as in the present matter), the Court will have the discretion to admit expert reports on stipulation. Nonetheless, should the Court decide to admit the expert reports proffered by the parties, Cable Interests submit that the Johnson Main and Supplemental Reports (**Exhibit 1** to the Declaration of Vincent J. Foley ("Foley Decl.") in support of Cable Interests' motion to preclude portions of the main and supplemental reports and testimony of Captain R. Russell Johnson (herein referred to "**Foley Ex. __**"), Johnson Main Report, dated February 15, 2018 ("Main Report") and **Foley Ex. 2**, Johnson Supplemental Report, dated April 5, 2018 ("Supplemental Report")) should be excluded based on the premises addressed in this motion.

[3] Bouchard Transportation Co., Inc. ("Bouchard Transportation"), Motor Tug Ellen S. Bouchard Inc. ("Tug Owner"), B. No. 280 Corp ("Barge Owner"), the tug M/V Ellen S. Bouchard (the "Tug") and the barge B. No. 280 (the "Barge") (Bouchard Transportation, Tug Owner, Barge Owner, Tug and Barge collectively, "Bouchard").

[4] 33 C.F.R. §110.155 (*see* **Foley Ex. 4**).

the factfinder such as causation, seaworthiness of the vessels, competence of Captain Yates and knowledge of Bouchard with respect to anchoring of its vessels in Hempstead Harbor.

These factual narratives and conclusory opinions are an improper use of expert testimony, are unreliable and if admitted, would intrude on the Court's role as the finder of fact. Johnson's opinions and conclusions (and the accompanying portions of his Main and Supplemental Reports) in these specific respects should be excluded from being offered or used as evidence at trial.

## STATEMENT OF FACTS

Johnson's curriculum vitae ("CV")[5] indicates he was a captain of tug and tow vessels from 1975 to 1983 and again from 1994-1996, and he has worked in operations management for three different tow boat companies during various periods up through 2012. *See* **Foley Ex. 3**, Transcript of the deposition of R. Russell Johnson, May 16, 2018 ("Johnson Tr.") at p. 11 (lns. 15-23). Johnson has never anchored a tug or tow vessel in the Port of New York nor has he sailed as a licensed mariner in any capacity in the waters of the Port of New York. *Id.* at p. 37 (lns. 10-16).

Johnson has been the self-employed sole proprietor of RJ Maritime Association LLC since 2012. This employment involved maritime project management, accident investigation, and legal consulting. *Id.* at p. 6 (lns. 3-13); pp. 44 (ln. 12) - 45 (ln. 11). Johnson has offered testimony in 23 cases. *Id.* at p. 47 (lns. 13-16). None of those cases have involved anchoring. *Id.* at p. 48 (lns. 2-7). Johnson cannot recall any incident involving anchoring in which he was involved as an expert or a consultant. *Id.* at pp. 48 (ln. 16) - 51 (ln. 2). Despite 30 years of involvement in accident investigations, Johnson has never investigated an accident where a tug captain dropped an anchor in a cable area and caused damage to a submerged cable. *Id.* at pp. 51 (ln. 4) - 52 (ln. 18).

---

[5] Johnson's CV is attached to his Main Report (**Foley Ex. 1**).

<u>Johnson's Proffered Opinions (Main Report)</u>

As noted above, Johnson authored one main report and one supplemental report.  **Foley Ex. 1**, Main Report; **Foley Ex. 2**, Supplemental Report.

The Main Report is comprised of eleven (11) pages of expert report, four (4) pages of CV, three (3) pages listing testimony, and one (1) page of service rates.  Johnson offers nine conclusions and opinions (Main Nos. 1-9) concerning *inter alia* the seaworthiness of Bouchard's vessels, the extent of and reasonableness of Bouchard's obligations to train, monitor, and rely on licensed vessel personnel "to make appropriate decisions regarding anchoring locations."  **Foley Ex. 1**, Main Report at p. 10-11.  The following is the text of Johnson's opinions and conclusions:

1.  Ellen S. Bouchard and the Barge B 280 were necessarily fitted to perform the job of anchoring.  The Tug and Barge were fitted with all necessary equipment and materials to allow those on board to make appropriate decisions regarding anchoring locations.  Both vessels were seaworthy and there were no deficiencies in the tug or barge that played a part in the decision regarding the anchoring on January 6th, 2014.

2.  The Ellen S. Bouchard and Barge B. No. 280 are separate vessels, fully capable of operating independently from one another.

3.  Bouchard anchoring procedures and guidelines as outlined in SMM 10.14 were in all respects adequate and it is my opinion they are well above industry standards.  They not only mention specific operating instructions for the physical act of lowering and raising the anchor but remind and caution the Mate and Captain to comply with all Federal Regulations. (see observation #4 and #6)

4.  The USCG and International Minimum Standards for training and sea service to become a Master on a Towing Vessel are extremely high. (observations 8, 9, 10, 11). This mariner not only had his United States Coast Guard License, but the USCG has also deemed that Captain Yates was STCW Compliant. Being STCW certified demonstrates that the Mariner has the knowledge, understanding and proficiency in the competence of anchoring a vessel (as depicted in Table 1, Observation #11). In my opinion, Bouchard Transportation had a reasonable assumption that Captain Yates was trained and assessed in the area of anchoring, and specifically what areas to avoid. Yates' decision to anchor in the cable area was a navigational error on the part of an otherwise qualified officer.

3

5.   There was nothing in Yates' personnel file or work history with Bouchard from which Bouchard could have reasonably anticipated that he would anchor the vessel in a designated cable area or in violation of Federal regulations.

6.   There is no requirement, no practice in the industry, and in my view, it is not necessary for management to provide training regarding reading or interpretation of charts or selection of proper anchorage locations. My view is that companies, like Bouchard, are entitled to rely on the Coast Guard license, Towing Master's certification and the STCW certification as a representation that licensed officers are properly trained and qualified on all the topics necessary to perform the job, which includes reading charts and choosing a proper anchorage.

7.   There is no requirement, no practice in the industry, and in my view, there is no need for Bouchard to monitor anchoring locations to verify that vessels were in fact anchoring in proper locations. (Observation #12) My opinion is that it is reasonable for Bouchard to rely on vessel personnel to make appropriate decisions regarding anchorage locations, consistent with regulations and consistent with principles of good seamanship.

8.   My opinion is that companies like Bouchard, are entitled to rely on the Coast Guard license as a representation that licensed officers are properly trained and qualified on all the topics necessary to perform the job, which includes reading charts and proper anchoring procedures. (Observations 8, 9, 10, 11)

9.   There is no requirement, no practice in the industry, and in my view, it is not necessary for management to provide instructions to vessel personnel regarding specific anchorage areas. In my view the vessel personnel know the characteristics of the boats, the weather conditions, and the waters involved, and in my view, are in a better position than office personnel to select an appropriate location. My opinion is that it is reasonable for Bouchard to rely on licensed officers to make appropriate anchoring decisions consistent with applicable regulations and principles of good seamanship.

### Johnson's Proffered Opinions (Supplemental Report)

Johnson's Supplemental Report is comprised of five (5) pages of supplemental expert report. The Supplemental Report offers five conclusions and opinions (Supp. Nos. 1-5) which, similar to the statements in Main Report, contain extensively weighted factual narratives ostensibly

4

in support of Captain Yates' decision to anchor in Hempstead Harbor, describing Bouchard's uses and practices with combined tugs and tow units, and Bouchard's provision of charts, publications, and "all necessary tools and guidance" for their Captains to perform their duties, which includes "interpret charts and make appropriate anchoring decisions." **Foley Ex. 2**, Supplemental Report at p. 4, ¶4. The following is the text of Johnson's Supplemental Report's opinions and conclusions:

1. It is my opinion Captain Yates made a judicious decision to seek a safe anchorage given conditions of zero visibility. The nearest anchorage was Hempstead Harbor. Hempstead Harbor, outside of the cable area, offers a reasonable anchorage area in the prevailing conditions. Bouchard Towing had no reason to believe that Captain Yates would make the decision to anchor in a cable area. Yate's decision to anchor in the cable area was a navigational error on the part of an otherwise qualified and fully credentialed officer.

2. As stated in my previous opinion the tug Ellen S. Burchard [sic] are separate units fully independent of each other. They are capable of and frequently do detach from each other to perform separate functions. Bouchard dispatch utilizes the tug to assist other vessels and tow other barges as exhibited by the push wires located on the tug and availability of a tow winch to tow other barges.

3. Bouchard Towing provides their tugs with all charts, publications, and regulations necessary to perform their operations. (Observation #2) There is no requirement, no practice in the industry (as exhibited in my polling of other towing companies), or in my view is it necessary for companies to provide training regarding reading or interpretation of charts, selection of proper anchorages, oversite of chosen anchorages or provide specific information or guidance on anchoring regulations applicable in specific locations.

4. Bouchard Towing provided all necessary tools and guidance to their Captains to enable them to perform their duties which includes interpreting charts and making appropriate anchoring decisions. (Observation #2)

5. Anchoring in Hempstead Harbor, outside the cable area, would not have been a violation[6] of 33 CFR 110.155.

---

[6] Johnson admitted he is not an expert in the CFR regulations for anchoring in Hempstead Harbor and not qualified to testify as to anchoring in Hempstead Harbor. **Foley Ex. 3**, Johnson Depo Tr. at pp. 24 (ln. 9) - 25 (ln. 7).

As described below in Point III, Cable Interests contend that a number of the above Main and Supplemental Opinions should be precluded as the alleged expert opinions improperly supply factual narrative, conclusory statements and in many cases seek to interpose alleged expert opinions as advocacy on the ultimate questions such seaworthiness of the Tug and Barge, competence of Captain Yates, and Bouchard's "privity and knowledge" of Captain Yates' negligent anchoring practices in Hempstead Harbor.

## LEGAL STANDARDS FOR THE ADMISSIBILITY OF EXPERT TESTIMONY

Under Rule 702 "an expert witness with 'specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue' may testify so long as that testimony is 'based on sufficient facts or data' and 'is the product of reliable principles and methods' that the witness has 'reliably applied . . . to the facts of the case.'" *U.S. SEC v. Mudd*, No. 11 Civ. 9202 (PAC), 2016 U.S. Dist. LEXIS 59273, *3 (May 3, 2016 S.D.N.Y.) (quoting Rule 702). "The fact that the trial will be to the bench does not diminish, let alone eliminate the requirements of [Rule 702] and interpreting case law." *In re M/V MSC Flaminia*, No. 12-cv-8892 (KBF), 2017 WL 3208598, *3 (July 28, 2017 S.D.N.Y.); *see also* FED. R. EVID. 104. "The party offering the expert testimony has the burden of establishing these requirements, and the Court acts as a gatekeeper to ensure that proffered expert evidence 'rests on a reliable foundation and is relevant to the task at hand." *U.S. SEC*, 2016 U.S. Dist. LEXIS 59273 at *3 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

"Even qualified experts may not, however, testify as to certain matters.  For example, courts routinely preclude experts from testifying as to the credibility of other witnesses or evidence. [] They also may not supplant the role of the factfinder by reciting factual narratives or by weighing the evidence to reach factual determinations." *Flaminia*, 2017 WL 3208598 at *4 (internal citations omitted).

## ARGUMENT

### I.   JOHNSON IS NOT QUALIFIED TO TESTIFY AS TO THE APPLICABLE ANCHORING REGULATIONS FOR HEMPSTEAD HARBOR.

Under *Daubert* and Rule 702, the Court must determine whether Johnson is qualified to offer opinions as to each particular subject matter on which he seeks to testify. *See Daubert*, 509 U.S. at 589; *see also Flaminia* 2017 WL 3208598 at *4 ("If . . . there is a mismatch between the area of expertise and the proffered opinions, there is a possibility of cloaked unreliability.") Johnson admitted at deposition (more than once) that he is not an expert in the anchoring regulations applicable to Hempstead Harbor in the Port of New York:

> Q.   Are you offering yourself as an expert in the federal regulations for anchoring in the Port of New York?
>
> A.   In the portion I read.
>
> Q.   So you read parts of the CFR, and that
>
> A    You know, I wasn't - - I actually wasn't asked to be an expert on the CFR. I was not asked.
>
> Q    Okay.
>
> A    And - - and I am not going to comment as an expert on those CFRs.
>
> Q    So you are not an expert in the Code of Federal Regulations - -
>
> A    No.
>
> Q    - - and - -
>
> A    And I don't believe.
>
> Q    You've got to let me finish.
>
> MR. MEEHAN: Let him finish.
>
> Q    - - Code of Federal Regulations for anchoring in the Port of New York that have been marked as Johnson Exhibit 4, right?
>
> A    Right.

**Foley Ex. 3**, Johnson Tr. at pp. 24 (ln. 9) – 25 (ln. 7).  Later in the deposition, Johnson further

testified:

> Q.   Now, is it your opinion that he [Yates] is permitted to anchor in Hempstead
>      Harbor outside the Cable area?
>      Mr. Meehan:   Object again because he wasn't asked to give an opinion on
>      this – regulations.  But you can answer.
>
> A.   Well, I mean, I would just say what I said before, and that's to repeat what
>      he said I wasn't asked to, you know, comment on the CFR Regulations.

*Id.* at p. 92 (lns. 8-17).

********************

> Q.   Okay and in the absence of an emergency, is it permissible for Captain
>      Yates or for Bouchard Tugs and Barges to anchor in Hempstead Harbor
>      outside of the cable area?
>
>      Meehan:       Objection.
>
> A.   Again, I am unclear.  And I was not asked to interpret the CFR's.  I am
>      unclear whether it is or not.

*Id.* at p. 93 (lns. 15-22).

As Johnson is not an expert in anchoring regulations applicable to Hempstead Harbor and

declined to comment on the applicable regulations at his deposition, the Court should strike Supp.

No. 5 which reads: "Anchoring in Hempstead Harbor, outside the cable area, would not have been

a violation of 33 CFR 110.155."  **Foley Ex. 2**, Supplemental Report at p. 6, ¶ 5.  Johnson also

comments on p. 3 of his Supplement Report as follows: It is not <u>expressly prohibited</u> and anchoring

in Hempstead Harbor is not necessarily a violation of 33 CFR 110.155.  Johnson admitted he is

not an expert in the CFRs pertaining to anchoring in Hempstead Harbor, and statements in Main

and Supplemental Reports which purport to interpret the anchoring regulations should be stricken

and any testimony from Johnson concerning such regulations should be precluded.

## II. JOHNSON'S OPINIONS AS TO INDUSTRY PRACTICE FOR MONITORING AND OVERSIGHT OF ANCHORING LACK VALID METHODOLOGY AND SHOULD BE EXCLUDED.

In Observation 13 of his Main Report and Observation 7 of his Supplemental Report, Johnson describes the following methodology used to form his opinion that Bouchard was not required to engage in oversight or monitoring of Captain Yates' negligent anchoring practices:

> 13. I have contacted operations personnel at several towboat companies including Dunlap Towing, Western Towboat, American Navigation, Foss, Crowley Maritime, and Young Brothers, and inquired about their current in-house procedures and training for anchoring mentioned in observation #11. <u>None of these companies require specific training, oversight of their vessel's anchoring practices, or provide specific instructions for anchoring.</u>

**Foley Ex. 1**, Main Report, at p. 9 (emphasis added).  In the Supplemental Report, Johnson states he had "discussed this matter with Operations personnel from the following East Coast Maritime Companies: Moran Towing Corporation and McAllister Towing."  **Foley Ex. 2**, Supplemental Report, at p. 1.  Johnson writes in his Supplemental Report at Observation #7:

> 7. On April 4th and 5th, I discussed the issues of this case with senior operations managers from Moran Towing and McAllister Towing.  As the West Coast Companies had responded in my initial report (Original report, Observation # 13) none of these companies require specific training, oversite of their vessels anchoring practices, check their specific anchorage co-ordinates, provide specific instructions for anchoring, or provide specific information or guidance regarding anchoring regulations applicable in particular locations.

*Id.* at p. 3.  Johnson testified that he had contacted operations personnel at selected tug and tow operators on the East and West Coast of the United States to poll them on oversight and monitoring policies and procedures for anchoring of their vessels.  **Foley Ex. 3**, Johnson Tr. at p. 83 (lns. 20-24).  Johnson contacted the tug and tow operators by telephone, but did not review any documents from those companies.  *Id.* at p. 84 (lns. 9 - 12).  He testified that the conversations lasted no more than 15-20 minutes.  *Id.* at pp. 83 (ln. 20) - 84 (ln. 16).  Those companies did not provide Johnson with any specific written information on their policies and procedures.  *Id.* at p. 86 (lns. 12-24).

Johnson relied on these brief telephone conversations to form his opinions that there is "no practice in the industry":

6.    …to provide training regarding reading or interpretation of charts and selections of proper anchorage locations…(Main No. 6)

7.    …for Bouchard to monitor anchoring locations to verify that vessels were in fact anchoring in proper locations… (Main No. 7)

9.    "…for management to provide instructions to vessel personnel regarding specific anchorage areas… (Main No. 9)

*********************************************

3.    There is no requirement, no practice in the industry (as exhibited in my polling of other towing companies), or in my view is it necessary for companies to provide training regarding reading or interpretation of charts, selection of proper anchorages, oversite of chosen anchorages or provide specific information or guidance on anchoring regulations applicable in specific locations. (Supp. No. 3)

**Foley Ex. 1**, Main Report at p. 10; **Foley Ex. 2**, Supplemental Report at p. 4.  Johnson cannot himself become a vehicle to convey factual or opinion testimony of other lay or expert witnesses at selected tug and tow companies.  While experts may rely on one another, "they may only do so if the requisite standards for reliability are met each step of the way.  If one expert's opinions are built upon the foundation laid by another, reliability of the latter requires reliability of the former." *Flaminia* 2017 WL 3208598 at *5; *see also Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 23-24 (2d Cir. 2017) (noting that a failure to independently verify data used in the report can itself constitute grounds for preclusion); *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) ("[Expert]'s failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results.

Thus, the District Court did not abuse its discretion in excluding [Expert]'s testimony."); FED. R. EVID. 703.

Here, Johnson relied on telephone calls to tug and tow operators to support his opinion on the lack of any industry practice for monitoring and oversight of anchoring.  With respect to his methodology to gather support for his opinion, Johnson testified:

Q. When you say contacted, you telephoned them?

A. I did.

Q. And you spoke to someone on the phone?

A. I did.

Q. Did you review their company documents?

A. No, I only spoke to them over the phone.

Q. So how long was the conversation approximately with each of these companies?

A. I doubt if it was more than 15 or 20 minutes each.

**Foley Ex. 3**, Johnson Tr. at p. 84 (lns. 3-16).  Johnson did not review any of the companies' policies, procedures, or Safety Management Manuals.  *Id*. at pp. 84 (ln. 22) – 85 (ln. 20).  Johnson's methodology is limited to the brief telephone contact and no document review with operations personnel whom he (or Bouchard's counsel[7]) perceived to have knowledge and expertise.  Johnson blindly accepted the veracity and expertise of these individuals based on this flawed and unreliable methodology.  Johnson's acceptance based on these scant conversations without verifying the

---

[7] Bouchard's counsel introduced Johnson to contacts at Moran and McAllister Towing:
Q: And did you know these – did you know Mr. Curtin from Moran Towing previously?
A. I don't think I'd met him before.
Q. Did you know Mr. Kress from McAllister?
A. Same answer.
Q. And how were you introduced to these people?
A. By Mr. Meehan [Bouchard's counsel].
*Id*. at pp. 108 (ln. 24) – 109 (ln 8).

veracity of their statements, is unreliable, and an impermissible use of hearsay. The Court should preclude Johnson from testifying as to the alleged industry practice and strike relevant portions of opinions at Main Nos. 6, 7, and 9 and Supp. 3 (as well as the underlying "Observations" #13 (Main) and Observation #7 (Supp.)).

## III. JOHNSON'S FACTUAL NARRATIVES, AND CONCLUSORY OPINIONS ARE INADMISSIBLE AS EXPERT TESTIMONY.

"Qualified experts must base their opinions on reliable data and a valid methodology. In the absence of either, the expert's opinions are unreliable and should not be allowed. Among the questions a court considers is whether the theory or methodology can be tested, whether it has been subjected to peer review and publication, whether it has a known or potential rate of error, and whether there is "general acceptance" of the methodology or theory." *Flaminia*, 2017 WL 3208598 at *5 (quoting and citing *Daubert*, 509 U.S. at 592-94). Johnson meets none of these criteria and instead offers self-serving factual narratives followed by a series of short statements, many of which include improper legal opinions and conclusions and do not comply with the standards of Rule 702. "An opinion that is speculative or conjectural is not based on a reliable methodology and fails to comply with the standards in Rule 702." *Id.* (citing *Daubert*, 509 U.S. at 590 (noting that "the word 'knowledge' [as used in Rule 702] connotes more than subjective belief or unsupported speculation")).

### A.    Johnson's Improper Factual Narratives Should be Stricken.

Johnson's factual narratives are not a proper use of expert testimony. *See Flaminia Flaminia*, 2017 WL 3208598 at *3 ("experts are not percipient witnesses to facts, and they cannot offer factual narrative in the form of expert testimony…"). Here, Johnson begins his Main Report by providing in "Facts and Observations" (Observations 1-8) a narrative creating his own facts and coloring other facts of record.

For example, Observation #1 begins with a narrative about the employment of the vessels, fitting of the tug with an "Intercon" coupler system, a description of the voyage and Johnson's understanding of statements and testimony from several Bouchard witnesses including Captain Yates, James Doller, and Eric Thomas. Johnson further writes "the decision to anchor by Captain Yates was made on the spur of the moment and he decided to seek refuge in Hempstead Harbor, Long Island Sound." **Foley Ex. 1**, Main Report at p. 4. Johnson is seeking to use this factual summary to interpose a version of events deemed favorable to Bouchard with the description of the "spur of the moment" decision by Captain Yates. When asked at deposition about the "spur of the moment" decision, Johnson stated:

> Well, in a relatively short—short period of time as opposed to—I am sure he did not anticipate anchoring in Hempstead Harbor six hours before that or a day before that or when he left Boston or -- I mean, the decision was made based on the conditions at the time that were reportedly zero visibility with fog. And he—for whatever period of time that was, he made a decision…

**Foley Ex. 3**, Johnson Tr. at pp. 59 (ln. 23) - 60 (ln. 12). Johnson's coloring of the critical events leading to Captain Yates' negligent anchoring decision by "ad lib" additions to the factual record is an improper use of expert testimony and should be precluded.

Johnson also notes in Observation #2 that the "Mate, Tony Hudgins, completed a Voyage Plan as required before the vessel left Boston and was in compliance with the voyage plan until they had to deviate due to the fog." **Foley Ex. 1**, Main Report at p. 4. At his deposition, Johnson admitted that he never viewed the actual voyage plan allegedly prepared by Hudgins (which has not been preserved or produced by Bouchard in this litigation) and did not know whether the Tug and Barge was in compliance with the voyage plan or what details might have been in the voyage plan for entry into the East River, Hell Gate, or New York Harbor. **Foley Ex. 3**, Johnson Tr. at pp. 62 (ln. 14) - 64 (ln. 23). This improper narrative, again, should be precluded.

In Observation #3, Johnson describes the role of the Tug and Barge crewmembers in setting the anchor as directed by Captain Yates. **Foley Ex. 1**, Main Report at p. 4. The factual narrative provides hearsay from interview statements of James Doller, the Tug's deck hand, to wit: "Doller stated in his interview that the anchoring evolution was uneventful." *Id.* Johnson also adds narrative such as "neither Thomas nor Doller played any part in the decision regarding where and when to anchor," and "at no time did he observe a sheen on the water" or "feel excessive strain on the windlass." *Id.* Finally, Johnson comments on behalf of all three crewmembers: "Captain Yates and his crewmembers were totally unaware that they may have damaged an underwater cable at the time." While these facts may be perceived as helpful to Bouchard by Johnson, they should not be allowed to enter the record through Johnson's expert reports or opinion testimony.

In his Supplemental Report, Johnson recounts his visit to the Tug and Barge in April 2018 and summarizes his interviews with Bouchard employees in Observations #1 and #2 of the report. From a visit to the Bouchard company headquarters, Johnson describes conversations with a Bouchard office dispatcher, Keith Shannon, in Observations # 4-6. Mr. Shannon is not a witness disclosed by Bouchard as having relevant information, and was not deposed in this matter, yet Johnson seeks to assert and rely on Shannon's comments on dispatcher communications with and responsibilities for anchoring of Bouchard's tug and barges.

In summary, Johnson offers improper narratives and biased conclusions based upon impermissible hearsay in the "Observations" in the Main (Nos. 1-8) and Supplemental (Nos. 1-6) Reports. Johnson's factual recounting of the events surrounding the incident and interviews of additional undisclosed Bouchard personnel are improper factual narrative and should be stricken including the narrative of the events leading up to the casualty (Observations Nos. 1, 3, and 4) the condition and capabilities of the Tug and Barge (Observation No. 2), Bouchard's documentation

14

and operational procedures (Observations Nos. 5-6), and review of Yates's personnel file (Observation Nos. 8). **Foley Ex. 1**, Main Report at pp. 4 (¶ 1) – 6 (¶8).

Johnson is not a percipient witness in this case, and it is improper to use the factual narratives in his expert report or opinion testimony as a vehicle to supplement facts of record or create new facts. For the foregoing reasons, Johnson's observations in Observations Nos. 1-8 of his Main Report and Observations Nos. 1-6 of his Supplemental Report should all be precluded.

### B.   Johnson's Conclusory Opinions go to the Ultimate Questions and Should be Precluded.

Johnson's opinions do not involve the application of scientific, technical, or other specialized knowledge required under Federal Rules of Evidence 702. The following listing of Johnson's opinions and conclusions amount to nothing more than *ipse dixit* and should be precluded. *See Flaminia*, 2017 WL 3208598 at *5 ("[C]onclusory opinions—often referred to as *ipse dixit*—fail to provide a methodology that would allow a court to assess reliability.") (citations omitted). For example:

> 1.   Ellen S. Bouchard and the Barge B 280 were necessarily fitted to perform the job of anchoring. The Tug and Barge were fitted with all necessary equipment and materials to allow those on board to make appropriate decisions regarding anchoring locations. <u>Both vessels were seaworthy and there were no deficiencies in the tug or barge that played a part in the decision regarding the anchoring on January 6th, 2014.</u>

**Foley Ex. 1**, Main Report at p. 10(emphasis added). This opinion intrudes on the factfinder's role to determine the ultimate question of "seaworthiness" of the Tug and Barge. Johnson concluded the Tug and Barge were "fitted with all necessary equipment and materials" even though he had never inspected the units before reaching the conclusion. **Foley Ex. 3**, Johnson Tr. at pp. 97 (ln. 25) - 99 (ln. 2). As such, the opinion is just *ipse dixit* based on Johnson's say so, "because there was nothing in the reports that I read that would lead me to believe that they were otherwise." *Id.* at p. 98 (ln. 24-25).

Similarly:

> 4.     In my opinion, Bouchard Transportation had a reasonable assumption that Captain Yates was trained and assessed in the area of anchoring, and specifically what areas to avoid. Yates' decision to anchor in the cable area was a navigational error on the part of an otherwise qualified officer.

**Foley Ex. 1**, Main Report at p. 10.  Again, Johnson's opinion is a conclusion that Yates' decision was a navigational error as opposed to grossly incompetent navigation.  The issue of Yates' competence, *vel non*, is for the factfinder to determine.

> 5.     There was nothing in Yates' personnel file or work history with Bouchard from which Bouchard could have reasonably anticipated that he would anchor the vessel in a designated cable area or in violation of Federal regulations.

*Id.* at p. 10, ¶¶ 1, 4 and 5.  As with the above conclusions, this opinion as to what "Bouchard could reasonably have anticipated" is for the factfinder to make based on the evidence introduced at trial including *inter alia* Yates' testimony, his personnel file and work history with Bouchard.

In the Supplemental Report (Supp. No. 1), Johnson also offers factual narrative as to the "judicious decision to seek a safe anchorage" and that "the nearest anchorage was Hempstead Harbor":

> 1.     It is my opinion Captain Yates made a judicious decision to seek a safe anchorage given conditions of zero visibility. The nearest anchorage was Hempstead Harbor. Hempstead Harbor, outside of the cable area, offers a reasonable anchorage area in the prevailing conditions. <u>Bouchard Towing had no reason to believe that Captain Yates would make the decision to anchor in a cable area</u>. Yate's[sic] decision to anchor in the cable area was a navigational error on the part of an otherwise qualified and fully credentialed officer.

**Foley Ex. 2**, Supplemental Report at p. 4, ¶ 1 (emphasis added).  Johnson also concluded in Supp. No. 1 above that "Bouchard Towing has no reason to believe that Captain Yates would make the decision to anchor in a cable area." Johnson expressed this opinion even though he was aware that Captain Yates previously had anchored Bouchard tugs and barges at Hempstead Harbor.  **Foley**

16

**Ex. 3**, Johnson Tr. at p. 61 (ln. 22-25). The Court will determine the issue of whether Bouchard "had reason to believe that Captain Yates would make the decision to anchor in a cable area." This ultimate question of fact and law, i.e., Bouchard's "privity and knowledge" is for the factfinder to determine and Bouchard's expert's conclusory opinions should be excluded.

As detailed above, many of Captain Johnson's Opinions and Conclusions in his Main and Supplemental Reports are improper in that they purport to usurp the role of the factfinder by reciting factual narratives to reach nothing more than *ipse dixit* opinions. *See Flaminia*, 2017 WL 3208598 at *4 ("[Experts] may not supplant the role of the factfinder by reciting factual narratives or by weighing the evidence to reach factual determinations."). For the above reasons, Johnson's improper legal opinions and conclusions should be precluded.

## **CONCLUSION**

For the foregoing reasons, Cable Interests respectfully request the Court to preclude Johnson from testifying on applicable federal regulations for anchoring in the Port of New York, on industry practice for monitoring and oversight of anchoring, and to exclude, as identified herein, Johnson's improper factual narratives, conclusory legal opinions and unreliable *ipse dixit* opinions.

Dated: New York, New York
       March 12, 2020

17

HOLLAND & KNIGHT LLP

By:___/s/ James H. Hohenstein_____
       James H. Hohenstein
       Vincent J. Foley
       F. Robert Denig
       Clayton J. Vignocchi
       31 West 52nd Street
       New York, New York 10019
       Tel: (212) 513-3200
       E-mail:jim.hohenstein@hklaw.com
           vincent.foley@hklaw.com
           robert.denig@hklaw.com
           clayton.vignocchi@hklaw.com

*Attorneys for Limitation Defendants/Claimants: Power Authority of the State of New York*

COZEN O'CONNOR

By:___/s/ Peter G. Rossi_____
       Peter G. Rossi
       David Y. Loh
       45 Broadway, 16th Floor
       New York, NY 10006
       Tel:  (212) 509-9400
       E-mail:PRossi@cozen.com
           DLoh@cozen.com

*Attorneys for Limitation Defendants/ Claimants: Princeton Excess & Surplus Lines Insurance Company; Westport Insurance Corporation; Aspen Specialty Insurance Company;  Navigators Management Company, Inc.,  New York on behalf of Lloyd's Syndicates: 1221 Navigators, 4000 Pembroke and 2015 Channel; and, National Union Fire Insurance Company of Pittsburgh, PA.*

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC

By:___/s/ James B. Glennon_____
       James B. Glennon (*pro hac vice*)
       222 North LaSalle Street
       Suite 1400
       Chicago, Illinois 60601
       Tel: (312) 863-5000
       E-mail: jglennon@fgppr.com

-and-

       Peter Billis
       40 Wall Street, 54th Floor
       New York, New York 10005
       Tel: (212) 257-7100
       E-mail: pbillis@fgppr.com

*Attorneys for Limitation Defendants/ Claimants:  Associated Electric & Gas Insurance Services Limited; Energy Insurance Mutual Limited; Brit UW Limited; and, Talbot Underwriting (US) Ltd.*

18